## Commonwealth v. Stallone.

*Criminal law — Murder — Fraud in drawing of jurors—Due process of law—Constitutional law—Waiver of defects—Act of Feb. 21, 1814.*

1. Due process of law means that the state must afford a person accused of a crime the due administration of its established course of judicial procedure, and this includes the established procedure in drawing juries.

2. A prisoner convicted of murder is entitled to a new trial, where it appears that three of the jurors who returned the verdict against him were neither talesmen nor jurors on the official list of jurors and that their names were not drawn from the jury-wheel.

3. In such case it is immaterial that the integrity of the three jurors was not questioned, that they had no knowledge of their names being improperly drawn, and that defendant had not, before entering his plea, raised any question as to the drawing, summoning and returning of the jurors.

4. A fraudulent drawing and impaneling of jurors is not such a mere "defect or error in drawing, summoning or returning of jurors" as is waived under the Act of Feb. 21, 1814, 6 Sm. Laws, 111, by a defendant in a murder case in going to trial.

Rule for new trial. O. and T. Lackawanna Co., Jan. T., 1923, No. 18.

*J. B. Jenkins,* 1st Assistant District Attorney, for Commonwealth.

*C. Balentine* and *D. J. Reedy,* for defendant.

MAXEY, J., Oct. 30, 1925.—We are asked to grant a new trial to Pasquale Stallone because of gross frauds in the drawing of jurors before the enactment of the new jury bill of April last and during the period when Stallone was tried and convicted of murder of the first degree.

The question of Stallone's guilt or innocence of first degree murder is not before us in this proceeding. Two juries have declared him guilty of murder of the first degree and the verdict was amply warranted by the evidence.

The question of the integrity of the jurors that tried Stallone is not before us. The integrity of those jurors is not challenged. The twelve men who sat on this case were, and are, under no suspicion. They were chosen for their important service only after being accepted both by the Commonwealth and the defendant, for they could not have gone into the jury-box had they been unacceptable to either side. No one questions the fact that the twelve men on this jury discharged their duty with fidelity and fully observed their oaths to "well and truly try the case and a true verdict render between the Commonwealth and the prisoner at the bar." No one even suggests that the jurymen in this case were guided in their deliberations by anything but the law and the evidence. This proceeding now before us and our decision thereon in no way reflect in the slightest degree on the twelve "good men and true" who sat in this case.

The question before us goes beyond this. It is the question whether Stallone, all the way from his arrest to his conviction, was accorded that due process of law which section 9, article I, of the Constitution of Pennsylvania guarantees to every accused by the mandate that no accused shall "be deprived of his life, liberty or property unless by the judgment of his peers or the law of the land," and whether Stallone was deprived of that "due process of law" commanded by the 14th Amendment to the Constitution of the United States in the following language: "Nor shall any state deprive any person of life, liberty or property without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

"It is difficult to define with precision the exact meaning and scope of the phrase 'due process of law.' Any definition which could be given would probably fail to comprehend all the cases to which it would apply. It is probably

Commonwealth v. Stallone.

wiser, as recently stated by Mr. Justice Miller, of the United States Supreme Court (in Davidson v. Board of Administrators, 17 Albany L. J. 223), to leave the meaning to be evolved 'by the gradual process of judicial inclusion and exclusion, as the cases presented for decision shall require:' " Stuart v. Palmer, 74 N. Y. 183.

The due course of legal proceedings in a mode suited to the nature of the case, according to those rules and forms which have been established for the protection of private rights, is due process of law: Walker v. Sauvinet, 92 U. S. 90; Kennard v. Louisiana, 92 U. S. 480.

The words "due process of law" imply conformity with natural and inherent principles of justice: Larabee v. Dolley, 175 Fed. Repr. 365.

" 'Due process of law' is not confined to judicial proceedings, but extends to every case which may deprive a citizen of life, liberty or property, whether the proceeding be judicial, administrative or executive in its nature. This great guaranty is always and everywhere present to protect the citizen against arbitrary interference with these sacred rights:" Stuart v. Palmer, 74 N. Y. 183.

" 'Due process of law'. . . excludes all mere arbitrary dealings with persons or property. It excludes all interference not according to the established principles of justice:" State v. Chittenden, 107 N. W. Repr. 500, 512.

"This constitutional guaranty (of due process of law) . . . is intended to secure the citizen from the arbitrary exercise of the powers of government, unrestrained by the established principles of right and distributive justice:" Kennedy v. State Board of Registration, 108 N. W. Repr. 730.

"Due process of law" means that the state must afford an accused the due administration of its established course of judicial procedure. The state is under the duty of affording the accused the enjoyment of all the rights and privileges which go to make up the due administration of the state's established course of judicial procedure: United States v. Powell, 151 Fed. Repr. 648, 654.

The established course of judicial procedure in Pennsylvania is that the jury-wheel shall be filled once each year by those whose duty it is to fill the wheel, that a list shall be kept of all the names placed in the wheel, and that no person shall be drawn for jury service except from the jury-wheel (except when required talesmen are summoned in the manner provided by law after the exhaustion of the regular panel of jurors).

Nothing can be imagined that would be a grosser departure from the established course of judicial procedure in Pennsylvania or elsewhere than that the names of persons called for jury service, instead of being drawn by lot from the wheel, which, when filled, contains 1800 names, should be selected arbitrarily by a small coterie of officials behind closed doors.

The facts established in a judicial proceeding ordered by us to determine the extent of the frauds perpetrated in the selection of jurors between the middle of January, 1925, and April 16, 1925, when the new jury bill was enacted into law, prove conclusively that juries in Lackawanna County during the first four months of the year 1925 (and how long before that, we have not determined) were drawn not from the jury-wheel, but from some other unknown source, possibly the vest pockets or fingers of the officials drawing them. Whoever these officials saw fit to put on grand juries, petit juries and traverse juries were put thereon, whether their names were in the jury-wheel or not.

For example, the list of jurors drawn for the first week of the January, 1925, term of Common Pleas Court was before us. The list contained 60 names. The sheriff and the jury commissioners certified over their own signatures

that the names of the 60 persons on the list were "duly drawn by the sheriff of said county and us, the jury commissioners aforesaid, from the wheel containing the names of the persons selected according to law for jurors for the several courts of said county." This certificate was untrue, for the names of 33 of these 60 persons were not on the certified list of jurors for 1925, and, therefore, could not have been drawn from the jury-wheel, as there were 1800 names placed in the wheel, and on the certified list of jurors, which was made at the time the names were placed in the wheel, there were exactly 1800 names.

For the second week of Common Pleas Court in January, 1925, the sheriff and two jury commissioners officially and formally certified to the names of 60 persons as having been drawn from the jury-wheel, and yet it was established that 33 of those 60 persons were persons whose names were not on the certified list of jurors, and, therefore, presumably, were not drawn from the jury-wheel.

For the criminal court held in the week beginning the first Monday of February, 1925, the week during which Stallone was tried, there was a list of 80 jurors. This list contained the following certificate, similar to those on the other lists:

"We, the undersigned, the sheriff and jury commissioners of said county, do hereby certify that the above alphabetical list contains the names of the 80 persons duly drawn by the sheriff of said county and us, the jury commissioners aforesaid. from the wheel containing the names of the persons selected according to law for jurors for the courts of said county, in obedience to a certain writ of *venire* in their hands for execution, on the 5th day of January, A. D. 1925, to serve as petit jurors in the Court of Quarter Sessions of the Peace and Oyer and Terminer for the County of Lackawanna, to be holden in Scranton, on the first Monday of February, 1925.

"Witness our hands this 5th day of January, A. D. 1925.

"JIM REAP, Sheriff,
A. B. DAVIS,
JOHN F. HEALY,
"Jury Commissioners."

It was established at the hearing held before us that 38 of the aforesaid 80 persons were persons whose names were not on the certified list of jurors, and, therefore, we cannot escape the conclusion that the names of these 38 persons were not drawn from the jury-wheel.

This was the week that Stallone was tried for murder, and three of these 38 persons whose names were not in the jury-wheel were accepted as jurors in the Stallone case. These three persons had nothing to do with getting on the jury panel, and the fact that they were placed on the panel illegally does not reflect in the slightest degree upon them.

For the grand jury that convened March 9, 1925, the sheriff and the jury commissioners officially and formally certified to having drawn from the wheel 24 names. It was established in judicial proceedings that 15 of these were persons whose names were not on the certified list of jurors.

For the two weeks of criminal court that began on March 20, 1925, the sheriff and jury commissioners officially and formally certified to the names of 160 persons as having been drawn from the wheel, and yet it has been definitely established that 92 of these were persons whose names were not on the certified list of jurors.

Between Jan. 18th, when the first drawing of jurors was made for this year, and April 6th, when the last drawing was made under the old jury law,

Commonwealth v. Stallone.

the sheriff and the two jury commissioners formally and officially certified to the names of 464 persons as having been drawn from the jury-wheel; and it has been conclusively proved that at least 242 of these were persons whose names were not on the certified list of jurors.

Since April 16, 1925, under the new jury law, jurors have been drawn from the wheel in the court-room in public by persons appointed at the time for that purpose by the judge or judges then presiding. For example, one week ago there were two panels of 80 jurors each drawn for the next term of criminal court. Although the same wheel is used as was heretofore used, and though the wheel has not yet been filled under the new law (the filling of the jury-wheel takes place each year at the end of the year), every one of the 160 names drawn from the jury-wheel corresponded with the name on the certified list of jurors. This is in striking contrast with the fact that out of 160 persons who were drawn for jury service during the two weeks' term of criminal court when Stallone was tried, 76 were persons whose names were not on the certified list of jurors.

The grand jury which convenes next Monday was drawn from the old wheel, yet each one of the 24 names drawn corresponded with an identical name on the certified list. This is in significant contrast with the fact that out of the 24 persons who served as grand jurors on March 9th last, 15 were persons whose names were not on the certified list of jurors.

Occasionally, in drawing from the old wheel under the new jury law, a name did not with complete accuracy correspond in spelling with the name on the certified list, and for this reason the name was discarded; and, on very rare occasions, in a list of 60 or of 80 names, one or two names were drawn which did not correspond with any name on the certified list. These infrequent cases in the hundreds of names drawn from the wheel since the new jury law went into effect are explainable as errors by the clerks to whom were called out the names on the certified list as the jury-wheel was filled in December, 1924.

But clerical errors cannot explain the fact that out of 464 names placed in the several lists of persons for jury service during the first four months of 1925, 242, or more than half of them, were persons whose names were not on the certified list of jurors, and, therefore, presumably, were not in the jury-wheel.

When jurors were drawn behind closed doors in the sheriff's office by the sheriff and the jury commissioners, 52 per cent. of the names certified as having been drawn from the wheel were not on the certified list of jurors, and, therefore, the inference is that they were not in the wheel.

Since jurors have been drawn in open court by disinterested persons, the percentage of those drawn from the wheel whose names were not on the certified list of jurors is only a fraction of 1 per cent.

This convinces us that the drawing of jurors during the first four months of 1925 was fraudulent.

Why the jurors who were certified as having been drawn from the wheel, when in fact they were not so drawn [were so certified], need not be discussed at length. That some persons were put on grand juries and other juries to carry out the sinister programs of certain interested individuals is self-evident.

The jury system in Lackawanna County, before the enactment of the new Jury Law of April 6, 1925, P. L. 244, was thoroughly polluted and poisoned.

This statement is made without any reflection on the integrity of the citizens who were regularly summoned for jury service during the era of hand-picked juries. We also wish it clearly understood that not all of the jurors

who were hand-picked knew they were hand-picked. Some of the jurors who were summoned for jury service, in spite of the fact that their names were not on the certified list of jurors, were men above reproach and above suspicion. As already stated, the three men on the Stallone jury whose names were not on the certified list of jurors were men whose integrity and good faith are not challenged. These men successfully ran the gauntlet of both the Commonwealth's and defendant's challenges. They were accepted as men who would "well and truly try the case between the Commonwealth and the prisoner at the bar," and they did. The best of men may sometimes find themselves in an army recruited by evil men or in an army whose purposes are sinister. In spite of the fact that the twelve men who tried Pasquale Stallone were men against whom there was not a breadth of suspicion, the fact remains that the panel of 80 men who served in the criminal court during the week in which Stallone was tried contained the names of 38 men who had no legal right to be there, because they had not been selected in the manner prescribed by law for jury service when the jury-wheel was filled, as is proved by the fact that their names were not on the certified list of jurors for the year 1925.

When three officials, a sheriff and two jury commissioners, can arbitrarily place on the jury panel of 80 men for any week of court 38 persons who have no legal right to be there, the administration of justice has completely broken down and no man's life, liberty or property is safe. Such a system means that the processes of justice are practically in the hands of three men. Theirs is the power to convict the innocent and to turn loose the guilty. In all the hundreds of cases that have arisen calling for an interpretation of the phrase "due process of law" there is not to be found another case like this.

One of the authorities cited in this opinion said: "Any definition which could be given (the phrase 'due process of law') would probably fail to comprehend all the cases to which it would apply."

Certainly no jurist who has ever attempted to define this ancient guaranty ever contemplated a situation like the one before us, and probably in no other court in any civilized country of the world has there ever been found a system of jury-tampering and private jury-control so bold and on so large a scale as this.

Applying some of the definitions quoted above to the facts of this case, we have no hesitation in deciding and declaring that when practically half the persons on the panel from which the Stallone jury was selected consisted of persons whose names were not in the jury-wheel, but were arbitrarily selected for jury service by officials whose sworn duty it was to draw jurors by lot from a well-filled jury-wheel, there was a violent and criminal departure from the due administration of the Commonwealth's established course of judicial procedure.

We could take a technical and formal view of this case and rule that, after plea entered by the defendant, it is too late to object to any irregularity in the drawing of the jurors who tried the case. We might hold that it was the duty of defendant's counsel to examine the certified list of jurors for 1925 that was filed of record in the office of the prothonotary, and to challenge any person who appeared for service as a juror in spite of the fact that his name was not on said certified list. We have also taken into consideration the Act of Feb. 21, 1814, 6 Sm. Laws, 111, which provides as follows: "No verdict hereafter given in any court, civil or criminal, in this Commonwealth shall be set aside, nor shall any judgment in any court be arrested or reversed nor sentence stayed for any defect or error in the precept issued for any court, or in the

*venire* issued for summoning and returning of jurors, or for any defect or error in drawing, summoning or returning any juror or panel of jurors, but a trial or an agreement to try on the merits, or pleading guilty, or the general issue in any case shall be a waiver of all errors and defects in or relative and appertaining to the said precept, *venire*, drawing, summoning and returning of jurors."

But we believe the correct view to take in this case is that the placing on the list of jurors by the sheriff and jury commissioners of persons whose names were not in the jury-wheel and not on the certified list of jurors is more than a mere "defect or error" in the drawing of jurors. It constitutes a fundamental invasion of the prisoner's right to be tried by a lawfully constituted jury. If some persons who held no commission as a judge should masquerade as a judge and proceed to function as a court on the trial of some person charged with a crime, no one would hesitate to declare such a trial a nullity, for there can be no legal trial by a judge who does not hold a commission from the Governor of the Commonwealth.

As was said by Thomson, J., in United States of America ex rel. Valotta *v.* Ashe, etc., 72 Pitts. L. J. 1057, discussing the question whether fundamental rights are waived by a prisoner's silence:

"Did the defendant waive his right to separate trials by his silence?

"In all criminal cases, and more particularly in felonies of high grade, the prisoner is not required to open his mouth at any stage of the proceedings. Even if he stand mute, a plea will be entered for him by the Commonwealth and the trial will proceed. He has the high prerogative of silence; a silence which the state dare not in any manner invade. In criminal proceedings involving the life of the prisoner, every step of the state's procedure is adverse, resting not at all on the prisoner's consent from the time of his arrest on warrant until he is led on the scaffold and the fatal trap is sprung.

"In the remorseless movement of the state's criminal machinery, consent has no place at all. The result which follows when adverse to the prisoner is justified only when procured by established procedure in strict accord with the law of the land. What course of reasoning when human life is at stake can justify an invasion by the state of a right of the prisoner guaranteed him by the law, on the ground that the prisoner has not spoken and has, therefore, by his silence consented?

"In Lewis *v.* United States, 146 U. S. 370, were laid down some fundamental principles. Among these, that a prisoner cannot waive the substantial rights incident to trial by jury; that the right of challenge is a substantial right; that it must appear affirmatively on the record that the prisoner enjoyed the rights guaranteed to him by the Constitution. . . . The Supreme Court . . . said: 'The public has an interest in his (the prisoner's) life and liberty. Neither can be lawfully taken except in the mode prescribed by law. That which the law makes essential in proceedings involving the deprivation of life or liberty cannot be dispensed with or affected by the consent of the accused, much less by his mere failure, when on trial and in custody, to object to unauthorized methods.' "

Every defendant on trial has an inalienable right to have the jury that is to try him drawn from a list of jurors that has been selected in the manner prescribed by law and by officials entrusted with this high duty. He has an inalienable right to have the panel of jurors from which are to be chosen the twelve men that are to try him drawn from the official jury-wheel, not from some one's hands or vest pockets. Such an invasion of the established methods of drawing jurors as we find before us in this case, in which the

Commonwealth *v.* Stallone.

indictment charges the highest felony known to the law (save only treason), rises far above mere irregularity of procedure. There are some irregularities which, even if known to a prisoner, he has no right to consent to and his consent, even if clearly and freely expressed, no more gives validity to a trial tainted by these irregularities than would his consent to being tried by a mob.

The fraudulent drawings of jurors in this county for the first four months of 1925 constitute a violent and dangerous departure from the ancient landmarks of the law, and to condone them in this case or to say they were validated by the prisoner's implied consent would constitute a reproach to the administration of justice. A community that departs from these ancient landmarks of the law is in danger of having the orderly administration of justice supplanted in some cases by having retribution meted out to offenders at the hands of a mob, and in other cases by having verdicts sold to the highest bidders for the favors of those who, under the jury system as it was administered in Lackawanna County before April 16, 1925, and as it is still administered in some other counties of the Commonwealth, control and manipulate the selection of jurors to pass on the lives, liberties and properties of others.

No matter how savage and pitiless a defendant's crime, no matter how conclusively his guilt may be proved, I would not be a party to sending him to the electric chair except over a route that faithfully adheres to the ancient landmarks of the law.

A new trial for Pasquale Stallone is, therefore, ordered.

Now, to wit, Oct. 30, 1925, the rule for a new trial on the ground of irregularities in the drawing of jurors is made absolute.

From William A. Wilcox, Scranton, Pa.